```
 1              UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                    CHARLOTTE DIVISION

 3   UNITED STATES OF AMERICA      )
                                   )
 4                                 )
                                   )
 5           vs.                   )   DOCKET NO. 3:22-cr-163
                                   )
 6                                 )
                                   )
 7   KRISTI HEATHER KING,          )
                                   )
 8                                 )
         Defendant.                )
 9

10           TRANSCRIPT OF ELECTRONICALLY RECORDED
               ARRAIGNMENT AND DETENTION HEARINGS
11            BEFORE THE HONORABLE DAVID KEESLER
               UNITED STATES MAGISTRATE JUDGE
12                    JULY 11, 2022

13
     APPEARANCES:
14
     On Behalf of the Government:
15
         Stephanie Laboy Spaugh
16       United State's Attorney's Office
         227 W. Trade Street, Suite No. 1650
17       Charlotte, North Carolina  28202

18   On Behalf of the Defendant:

19       Peter Adolf
         Federal Defender's Office of Western North Carolina
20       129 West Trade Street, Suite 300
         Charlotte, North Carolina  28202
21

22
            Deborah Cohen-Rojas, C.S.R., R.D.R., C.R.R.
23                   Official Court Reporter
         Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
24   Proceedings stenographically transcribed via digital recording.

25
```

1    THE COURT:  -- and this matter is charged by a Bill of
2  Indictment.  Today it's on for an arraignment and a detention
3  hearing.

4    So, Mr. Adolf, first of all, is she prepared to be
5  arraigned?

6    MR. ADOLF:  She is, your Honor.  She's received a copy
7  of the Bill of Indictment and has reviewed it.  We will waive
8  any further reading, and I'd ask that a plea of not guilty and
9  demand for a jury trial be entered on her behalf.

10    THE COURT:  Very well.  Madam Clerk, let's show,
11 please, that we did proceed to arraignment today in Miss King's
12 case.  Mr. Adolf is here for her.  Through him, the defendant
13 waives a further reading of the bill.  She enters a plea today
14 of not guilty and requests trial by jury.  That will constitute
15 arraignment in the case, and we'll issue the usual orders to
16 Mr. Adolf.

17    Also, as part of arraignment today, pursuant to the Due
18 Process Protections Act, the Court does confirm the obligation
19 of the Government to disclose to the defendant all exculpatory
20 evidence in the case pursuant to Brady versus Maryland.  The
21 Court will order the Government to comply with that obligation.
22 Failure to disclose exculpatory evidence in a timely manner
23 could result in adverse consequences, including exclusion of
24 evidence, adverse jury instructions, dismissal of charges,
25 contempt proceedings, or other sanctions.

1    So that takes care of arraignment.  We'll move ahead now
2  to consideration of bond.  Does she wish to be heard on bond
3  today?

4         MR. ADOLF:  Yes, your Honor.

5         THE COURT:  All right.  Miss Spaugh.

6         MS. SPAUGH:  Thank you, your Honor.  We are asking for
7  detention.  The defendant is charged with sex trafficking of a
8  minor, and there is a presumption due to that charge that there
9  are no condition or combination of conditions that can
10  reasonably assure her appearance or the safety of the community
11  because of the offense.  She's facing, at the very least, 10
12  years of imprisonment all the way up to life for this charge.

13    Looking at the nature and circumstances of this offense,
14  the evidence shows that the defendant was arranging
15  commercial-sex transactions for the minor victim from mid-July
16  to September of 2021 and again briefly in December of 2021 in
17  Charlotte and Fort Mill.

18    The minor victim in this case was 15 years old at the time
19  and was reported missing at the end of June of 2021.  She
20  reported that the defendant's boyfriend would keep the cash
21  payments from customers, and the defendant would keep the Cash
22  App payments.

23    The investigation began on September 2nd of 2021.  The FBI
24  found commercial-sex advertisements on a Web site used for
25  commercial sex, skipthegames.com, depicting the minor victim

1 and offering her for commercial sex, so they conducted an

2 operation to recover the victim on that day. An undercover

3 contacted the number on the advertisement and set up an hour

4 in-call at a hotel in Fort Mill, which is when a customer comes

5 to the commercial sex provider at their location -- in this

6 case, a hotel.

7     When the FBI arrived, they saw the defendant and her

8 boyfriend sitting outside of the hotel entrance, and they saw

9 the defendant using the cellphone during the same timeframe

10 that the undercover was texting the advertisement number.

11     The undercover arrived to the room that he was given from

12 the text, and in it he found the minor victim, also found

13 condoms, and they sized two cell phones from the room that day.

14 Once law enforcement overtly approached the car in the parking

15 lot, the defendant and her boyfriend left the hotel.

16     While with the victim, law enforcement saw the name

17 Heather King calling the victim's phone multiple times and then

18 later saw the victim's phone receive FaceBook messages from

19 Heather King saying, "Please let me know something." A hotel

20 employee later reported to law enforcement that the defendant

21 and another woman came back later that day to try and get a key

22 for that room that the victim was found in.

23     Law enforcement continued to investigate and found

24 commercial-sex advertisements depicting the minor victim from

25 July through September of 2021. They obtained search warrants

for the victim and defendant's FaceBook accounts, where they
found messages from mid-July to September showing that the
defendant was arranging commercial-sex transactions with
customers for the victim and then relaying the arrangement to
the victim.

They also found that some customers would pay the
defendant's Cash App account.  For example, there are messages
between the victim and the defendant from July 30th of 2021
where the victim asked what the defendant's Cash App is and she
responded "mighty fine Heather 7715."

Later that day, the defendant told her, "It's a play
coming, 60 for five minutes," which would be $60 for five
minutes of time.  A "play" is a term commonly used to refer to
either commercial-sex customers or commercial-sex transactions.

There are messages from July 31st where the victim said
that she wanted to take a break, she didn't have a play coming
after this one, and asked the defendant if that was okay.
About 30 minutes later, she told the defendant that her stomach
hurt and she needed a pain pill.  The defendant told her that
she could chill after this for a little unless big money came
through.

There are messages from the defendant on August 6th where
she said, "Bring us the money real quick," and the minor victim
reported that she would bring the defendant or the boyfriend
the money, either after every transaction or every few

transactions.

There are messages from August 11th where the defendant sent the minor victim a room number and said to tidy up the room because she had plays lined up to come. In another message that day the minor victim mentioned that she was 16.

Later that day, the victim asked the defendant why she couldn't leave since they were okay with another girl leaving. Messages from July 28th show the victim asking the defendant how much this one is, and the defendant told her 100 QV. "QV" stands for "quick visit," which is a common term for 15 minutes of time in the commercial-sex world. The defendant asked if he's in there yet, and the minor victim asked her where the condoms were.

On July 31st, the defendant asked the minor victim if she was done, and the victim told her that "He's leaving now." The minor victim asked for the defendant's Cash App, and the defendant sent it to her. Later that day, the defendant told her a hundred QV, and the minor victim said, "He's going to be my fifth play today." The defendant said, "200 coming up," and she also told the minor victim that they were at Walmart getting what she needed.

On August 11th, the minor victim asked the defendant about going to stay with family for a week. The defendant essentially threatened to leave here her and told her that she wouldn't see them anymore if she went because they would go

1  back home.  She also told the minor victim that day that they

2  risk a lot with her.

3      On August 16th, the defendant appeared to be in an

4  argument with the victim.  She referred to the victim being her

5  child's age and told her, "Watch who you talking to, you're

6  talking big, we know everywhere you be."  And she said, "I

7  don't argue with girls that's young enough to be my child," and

8  that they had helped her out enough.  She also told the minor

9  victim, "Girl, you are 16, runaway, and we changed you, and you

10  got ahead of yourself."

11      At some point in August, the victim did leave to visit

12  family in a different city.  Messages from September 1st show

13  that the defendant and her boyfriend picked up the victim and

14  brought her back to Fort Mill on that day.

15      Messages from September 2nd, which is the day that law

16  enforcement recovered her, show that the defendant was setting

17  up commercial-sex transactions for the minor victim and then

18  relaying the amount of time and the price to the victim.

19      Law enforcement also reviewed text messages from the phone

20  seized from the hotel room.  There are messages from July 19th

21  where the defendant told the minor victim to send her the good

22  pics of her.  The victim then sent her about 10 images of

23  herself, and the defendant responded "body pic, too."  The

24  victim then sent about 13 images of herself in a bra and

25  underwear that appear to match some of the pictures posted in

her commercial-sex advertisements.  The defendant also told her
to clean up her room and air it out because she had some plays
coming.

On July 19th, the defendant messaged the minor victim and
said, "And another one say they coming, just waiting to let me
know how far he is, and this one is for 150."  She said, "The
first guy coming in 80, then 150 if the other one come."  AT&T
provided records in response to a subpoena showing that the
subscriber of that phone number was the defendant.

There are messages in the defendant's FaceBook account
from September 4th, which is two days after the FBI had rescued
the victim.  A friend asked her how they lost their stuff, and
the defendant responded, "She was a missing person, and she
was only 15."  And she told her friend, "She told us she
always 16."

On December 10th, the minor victim was reported as missing
again.  Law enforcement recovered her Christmas morning at an
apartment with others unrelated to this investigation.

While she was missing, on December 16th, they interviewed
the defendant.  At that point in time they did not know where
the victim was, so they were trying to just locate her.

The defendant told them she had not seen the victim
recently and she didn't know that she had run away.  She
claimed that she met the minor victim about two weeks before
she was taken into custody by the FBI in September of 2021.

1 She said the victim initially told her she was 19 over the
2 phone, but she said she was 18 when they met in person, and
3 that she thought she was 17 or 18.  She claimed that she only
4 found out the minor victim's real age after she was taken into
5 custody.

6 She said that the three of them hung out for a while
7 before the minor victim was posted in the commercial-sex
8 advertisement, and, after about a week, the minor victim wanted
9 to make money, and so she started posting advertisements for
10 plays.  She said that the minor victim offered her money to the
11 defendant's boyfriend and that it was his former girlfriend
12 that was the one that was posting the commercial-sex
13 advertisements of the victim.

14 She also said that she tried to tell the minor victim not
15 to see plays and that she never directly received money from
16 the minor victim's plays, but she paid for the hotel room that
17 they shared.  She said she could only think of one time when a
18 customer had paid through her Cash App account.

19 In the later interview, the minor victim reported to the
20 FBI that in December she was with the defendant and her
21 boyfriend until she had moved to the apartment that she was
22 found at with others.  She estimated that she saw more than
23 seven dates while with them at two different hotels in that
24 short period of time in December.

25 The defendant's FaceBook messages from December 11th show

that she asked her boyfriend, "Have you even found someone with
ID to get them a room?" And says, "This is too much stress on
me, and you chilling at the Days Inn, and they just sitting in
a room when they could be making money."

The next day, on December 12th, she told her boyfriend,
"Try to get them a room while I'm at work." On the 13th, she
said, "You can't even help me text, and I'm at work." And on
the 16th, which is the day she was interviewed by the FBI, she
said, "A play there," and he said, "Okay." She then said, "I
can't keep stopping, they left because I can't stay on top of
texting, it's too much, and I'm trying to do my job and missing
money."

Law enforcement found the screenshots in her boyfriend's
FaceBook of messages between them where she discussed with him
her talk with the FBI when they were looking for the victim.
She told him that the FBI had come to her job looking for the
victim. She referred to her by name. She said that they
thought she was with them, but she told them that they hadn't
been around each other and that they hadn't been around the
victim.

She said that the FBI told her about what the -- what the
victim was saying about them and asked what they do for work
and what she told them. And she also told him that they saw
them leave out a parking lot, referring to that day in
September.

1   There was another screenshot of their messages where she
2  told him, "I just didn't want them to get you, so I stayed
3  away, and the girl lied to us and really told them everything
4  when she got locked up, and I got you and me out of it."

5   The victim has spoken to FBI law enforcement multiple
6  times.  She's reported that the defendant took some of her
7  pictures used for commercial-sex advertisements and that the
8  defendant posted some of her advertisements.  She said that the
9  defendant was always available and communicated with her when
10 she had dates to make sure she was safe and that she usually
11 kept the defendant updated.

12   She said that customers would sometimes pay through Cash
13 App, and, when they did it, they sent it to the defendant's
14 account and that the defendant would keep that money.  She said
15 the defendant or her boyfriend would buy her supplies, and the
16 defendant bought her clothes.  FaceBook messages corroborate
17 that and show the defendant asking the victim on different
18 dates what she needed.

19   The victim also reported that they would get two hotel
20 rooms, one where she would sleep and share with the defendant
21 and her boyfriend, and the other that she would use for the
22 commercial-sex transactions.  She also said that the defendant
23 was the one bringing in girls to work.

24   Law enforcement also obtained MegaPersonal records, which
25 is another Web site commonly used to post commercial-sex

advertisements, and that showed the victim's commercial-sex
advertisements posted on that Web site, show that an account
with the defendant's email -- that's also her registered email
for her FaceBook -- posted advertisements of the victim on
August 9th, 10th, and 11th, August 23rd through 25th,
August 30th through 31st, and September 1st and 2nd of 2021.

Hotel records from the Sonesta Hotel in Charlotte from
July 19th through the 21st show a room in the defendant's name.
Law enforcement found commercial-sex advertisements of the
minor victim from that day.  Messages on one of the phones
found in the room show that the unit of the phone sent that
hotel address to a customer, and then they sent to the
defendant's Cash App for payment.

Looking at the pretrial report, it shows a recent failure
to appear from Georgia.  It also shows that she was convicted
in 2010 of assault and battery and that she has felony charges
before that that were dismissed.

When the FBI was trying to arrest her for this warrant,
they tried to meet with her the week before last and set up a
meeting time, but she changed her mind and decided not to meet
with them, so they went to her two places of employment, which
was a hotel and a store.

The hotel said that she worked there until about the
second week of June and then fired her because she continually
failed to show up for work, and the store also reported that

1  she stopped showing up for work.

2      Looking at the pretrial report, she reported that she

3  baby-sits for employment.  She has an unknown start date, is

4  obviously unstable.  It's not appropriate for her to be around

5  children and doesn't say how long she's been doing that.

6      She also has unstable housing.  When the FBI arrested her,

7  she said that she had been at that apartment for five or six

8  days.  Looking at the pretrial report, it says that she moved

9  in July 1st, and the last name was unknown, is a friend that

10  she was living with.  There were children there when the

11  defendant was arrested, inappropriate for her to be around any

12  children with these charges.

13      She was living in a hotel before that.  At least, that's

14  what she told the FBI when they arrested her.  And it also

15  appears that she was living out of hotels during this crime and

16  moving hotels frequently with the minor victim.

17      So the Government submits the evidence is strong that she

18  is a danger, as well as a flight risk, and that she cannot

19  overcome the presumption here, so we are asking that she be

20  detained.

21          THE COURT:  All right.  Mr. Adolf.

22          MR. ADOLF:  Judge, not to put too fine a point on it,

23  but, when the prosecutor finally got to actually talking about

24  what we're here for today, which is the characteristics and

25  history of Miss King to see if the Court can release her on

conditions, I started a stopwatch, and I think we were still
under a minute when they sat down.

So what we heard a whole lot about was about the case. We
heard nothing about any kind of violent behavior or personal
danger to small children or anything like that. What we heard
was a whole bunch of stuff taken from cell phones, which --
where there's a boyfriend involved, who sounds like it's likely
he's going to end up being the ring-leader when this all shakes
out, and who was on what phone when, saying what, is going to
be a major point of contention possibly. Maybe not. I have no
idea what's going on with the boyfriend's case. I don't see
him as a codefendant, at least from this indictment. So we
don't know where that's going.

We did hear some stuff about the minor victim talking
about how she was buying her clothes and making sure she was
safe, so there's clearly different things going on among the
three of them. And what that relationship is obviously will be
a big factor going forward.

But skipping to the final minute of the prosecutor's
presentation and actually talking about Miss King, you have
somebody who does not have a single conviction worthy of
consideration according to the Sentencing Commission. They did
talk about a misdemeanor assault back in 2009 when she was 19.
It says 30 days. I'd be curious to see if that was a suspended
sentence or not. They sometimes miss those.

1    Since then, we have a couple of driving-without-a-license.
2 And this failure-to-appear that they started out with was --
3 what -- two weeks ago -- so -- on a traffic ticket in Georgia.
4 I don't even know -- I don't know how fast you go to traffic
5 court in Georgia, but, if -- if it's anything like here, it may
6 have been that she was already locked up by the time that
7 happened or who knows.  But to think that's indicative of
8 whether she's going to come back to court here, I think it
9 beggars belief.

10    The bottom line is she doesn't really have a record.  She
11 is local.  Her -- I -- I understand the -- I found the
12 probation's recommendation interesting because they recommend
13 detention, but they also said, in case the Court thinks
14 otherwise, they set out what they think appropriate conditions
15 would be.  It's a little unusual.

16    I think that they understand this may be different from
17 what we normally see in a sex trafficking or sex involving a
18 minor-type of charge, where there's no allegation of any kind
19 of hands-on abuse by a minor and nothing in the facts or in her
20 background to suggest that, while she's on bond, she presents
21 any immediate danger to children or anyone else.

22    I think the real issue is the fact that she's been
23 unstable residence-wise and is moving around from hotel to
24 hotel and so forth.  Her cousin is here in court today.  I just
25 talked to her before court, lives in Denver with her

1  grandmother, which is Miss King's great-aunt, in the house that
2  the great-aunt owns.  She is here in court supporting her and
3  because they would be willing to provide a place for her
4  Miss King to stay.  They're not planning on charging her
5  anything.  She'd just help around the house.
6      There are minor children in that household, as well.  They
7  are ages 6, 4, and six months.  I asked the cousin if she's
8  aware of what the charges are against her cousin.  She is.  I
9  asked her if she has any hesitation about having her around her
10 children.  She said absolutely not.  She knows she's a good
11 person and so forth.
12     So at the end of the day, what we have is an indictment
13 charging a charge that is very serious.  The facts of it are a
14 lot more ambiguous and suggest that there is a relationship
15 going on where -- and just taking this from the prosecutor's
16 facts -- which I'm hearing for the first time, not in discovery
17 or anything like that -- you have a teenager who may or may not
18 have been already involved in this industry, portrayed herself
19 that way, portrayed herself at various times, at various ages,
20 where it was ambiguous whether she could do that or whether she
21 was of age or not in any sense.
22     And there was a relationship going on with Miss King and
23 her boyfriend where he may have been running the show, unclear
24 whose phones are what, but it is hardly a clear-cut case and
25 somebody who's a danger to children.

1    Particularly in the environment we're in, where jail space
2  is so scarce, where there's so many difficulties with getting
3  somebody to court and back -- I had a sentencing this afternoon
4  in front of Judge Cogburn that just got canceled on Friday
5  because of transport issues from Ocilla, where they are housing
6  a lot of our folks.  They're now housing them in Sparta, in
7  south Georgia.  I'm told that there are beds opening up at
8  Butner where they're going to put pretrial detainees at some
9  point.  So I think jail is a scarce resource at this time, and
10  forgetting all the health issues and everything else.
11    So I think the Court has to take a hard look beyond just
12  the basic indictment and say, is this a person that I'm
13  concerned about is going to commit new crimes while they're out
14  on bond or disappear or be a danger to anybody?  And I think
15  it's -- it's totally clear that that's not.
16    Your Honor, can -- can put her on house arrest and
17  whatever other conditions are available.  Probations recommends
18  sex-offender conditions if she is indeed released.  Whether I
19  think that's necessary or not is not really relevant, but
20  that's something the Court has at its disposal.
21    I certainly think your Honor can release her to go live
22  with her great-aunt and cousin and cousin's -- I guess,
23  cousin's once-removed, at their family home in Denver.  And she
24  can stay there and probably won't have to leave the house much,
25  if at all, and then will be back to court when she needs to be.

1          THE COURT:  All right.  Thank you.

2      Miss Spaugh, one question that sort of jumped out at me

3  was the one that Mr. Adolf has raised.  Perhaps you can't speak

4  to this, but I'm just curious why the boyfriend has not been

5  charged.

6          MS. SPAUGH:  I don't know if I can answer that, your

7  Honor.

8          THE COURT:  Okay.  All right.

9      All right.  Well, here's what we'll do.  The -- the

10 presumption of detention does arise from the charges.  The

11 Government's forecast of the evidence is very serious.  The

12 pretrial services report is somewhat unusual, but at least, in

13 the first instance, recommends detention, although it certainly

14 does offer an alternative.  But I do think detention is

15 appropriate here, and so I will order that she be detained

16 pending further proceedings.

17     All right.  Thank you.

18     (End of proceedings.)

19

20

21

22

23

24

25

```
 1

 2                        C E R T I F I C A T E

 3

 4

 5

 6            I, DEBORAH COHEN-ROJAS, Federal Official Court

 7   Reporter for the United States District Court for the Western

 8   District of North Carolina, a Certified Shorthand Reporter,

 9   Registered Diplomate Reporter, and Certified Realtime Reporter,

10   do hereby certify that the foregoing transcript is a true and

11   correct transcript of the digitally-recorded proceedings

12   transcribed under my direction.

13

14            Dated this 9th day of August, 2022.

15

16

17

18
                            Deborah Cohen-Rojas
19
                        _____
20                          DEBORAH COHEN-ROJAS
                            CSR, RDR, CRR
21                          Federal Official Court Reporter

22

23

24

25
```