UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
UNITED STATES OF AMERICA       )
                               )
         vs.                   )    DOCKET NO. 3:22-CR-163
                               )
KRISTI HEATHER KING,           )
                               )
         Defendant.            )
_____)
```

TRANSCRIPT OF ELECTRONICALLY RECORDED
MOTION HEARING
BEFORE THE HONORABLE DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE
AUGUST 31, 2022

APPEARANCES:

On Behalf of the Government:

       STEPHANIE SPAUGH, ASSISTANT U.S. ATTORNEY
       U.S. Attorney's Office
       227 W. Trade Street, Suite 1650
       Charlotte, North Carolina  28202

On Behalf of the Defendant:

       PETER ADOLF, ESQ.
       Federal Defenders of Western North Carolina
       129 West Trade Street, Suite 300
       Charlotte, North Carolina  28202

(Stenographically transcribed via digital recording.)

JILLIAN M. TURNER, RMR, CRR, CRC
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

THE COURT: Okay. The first matter we'll take up this morning is our 10:25 item. This is Kristi Heather King. The number on this is 3:22-CR-163. Mr. Adolf is here for her. Ms. Spaugh is here for the Government on this.

This matter is on for consideration of a motion for release on conditions, which is, I guess, collectively Documents 13 and 14; also the Government's response in opposition to that motion, which is Document No. 15. So I've reviewed those documents in advance before court this morning.

Mr. Adolf, happy to hear from you.

MR. ADOLF: Thank you, Your Honor.

I -- I think what -- what I'm going to stress is going to be a little different than it would have been before yesterday when I got the Government's summons, which I, frankly, found disappointing in terms of not addressing the elephant in the room in this case, which is that significant exculpatory evidence, namely their victims' statements exculpating Heather, were withheld from me and from the magistrate judge and, I guess, from Your Honor at the bond hearing.

The way these things work here -- Your Honor's been doing this longer than I have. It's been a year in the old building and in this new building -- is the Court relies

significantly on the proffers by the Government at these bond
hearings.  We don't put witnesses on.  We rely on the good
faith and the accuracy of what the Government tells us.

And I -- you know, I've heard Your Honor say
hundreds of times, in looking at the issues around bond, "The
Government's forecast of the evidence is strong."  And that
is obviously something appropriate for the Court to consider.
We rely on, all of us, because I don't challenge that as a
matter of course.

You know, the -- actually, the rules of bond
hearings allow the magistrate judge to require testimony in
support of the Government's forecast of its case.  That's not
generally done because we rely on the fact that prosecutors
-- and Your Honor is well aware of it from having done it
yourself -- have a very delicate job they have to do, which
is to be an advocate, but also take a hard look of their own
cases and recognize the weaknesses and deal with that
appropriately; and the way we deal with that appropriately is
to reveal that to all.

The Government picks their cases and presumably has
confidence in the strength of the case.  And in this case,
like every other case that we deal with at that stage, we
began by doing arraignment, and then Your Honor read from the
Due Process Protection Act.  And as part of that, I attached
the transcript of that hearing as the second exhibit to my

1  motion.  And Your Honor talked about *Brady vs. Maryland* and
2  said, "Failure to disclose exculpatory evidence in a timely
3  manner could result in adverse consequences," and then listed
4  the adverse consequences.

5       I expected when I got the Government's response
6  yesterday for there at least to be some acknowledgment that
7  maybe this information should have been provided to the
8  magistrate.  That maybe at least it should have been provided
9  to me.

10      Because, you know, there's a lot in the
11  Government's response about how I'm victim blaming by saying
12  what the victim said.  Well, I attached what the victim said.
13  I wanted the Court to see that.  It's not coming from me.
14  It's not even coming from Heather.  It's coming from their
15  own victim, the main witness, the essential witness in their
16  case.  And every word out of her mouth that I could read in
17  there exculpated Ms. King.

18      And I understand how these things go.  As an
19  advocate, it's tough not to spin the things the best way you
20  can.  But they have a different duty; and the duty is of
21  candor and the duty is to do the hard work of taking a hard
22  look at your case.  You know, I've seen it a lot in my nearly
23  30 years of doing this work where you have some prosecutors
24  unfortunately who think, well, they've decided the person's
25  guilty and that, therefore, there's no such thing as

exculpatory because there's just evidence that's confusing or muddies the issues.

No acknowledgment whatsoever in this paperwork or in the responses that maybe things ought to have been done differently.

And it gets worst, frankly, because right after I filed this motion the Government provided or sent over a big load of new discovery. And going through it and organizing it, my paralegal informed me that there were jail calls in there; over 400 jail calls. This was provided, again, after I filed this motion.

So I emailed the Government and -- once I found this out and pointed out that I'm hopeful that this is just a normal discovery production and that what I'm not getting is a giant haystack where there's needles in there that I'm expected to find in the short period before this hearing that can get used against us. And if I'm wrong, please advise.

And the response I got was: There are calls between your client and Batten that I will advise the Court of the existence of to the extent needed to rebut your coercion claims.

So, in other words, the Government dumps 400 jail calls on me, and I am expected to listen to all of them. My paralegal was doing that diligently for hours and hours and hours. Didn't manage to get through all of them. Didn't

1 find anything that contradicts anything that the victim said,

2 but now I guess the Government's plan is that we're expected

3 to listen to another proffer from them of what the evidence

4 is.

5 Now, the reason I didn't bring up any of this stuff

6 about the Due Process Protection Act or *Brady* or anything in

7 my motion was because I thought it was -- at the end of the

8 day what we're focusing on is bond. But apparently the

9 Government is doubling down on the stretch, which is now they

10 realize that they have to at least say that they turned it

11 over to me, but not in a timely fashion such that I can

12 actually use it and figure out what it is they're going to

13 cherry-pick out of 400 calls and try to spring on myself and

14 the Court at this hearing.

15 So what I was waiting to hear some sort of excuse

16 or at least apology for what we saw at the last bond hearing.

17 Instead, we have the Government doubling down. Apparently,

18 if you don't get punished for it, it's okay.

19 So, Judge, when you-all -- when you told the

20 Government that there are adverse consequences potentially

21 for *Brady* violations, I was -- at the end of the day, the

22 reason why I didn't put it in the motion I was hard-pressed

23 to figure out what's the appropriate consequence for a *Brady*

24 violation in a bond hearing. There's not a lot of law on

25 that. We're in unchartered territory here.

1          What I would propose is not really a sanction.
2    It's more like a common sense response, which is Your Honor
3    has the discretion under the statute to require live
4    testimony in lieu of a proffer.  What we got last time was
5    proffer that left out the fact that the star witness, the key
6    witness, the victim.  Without them, there is no case that
7    says that my client was trying to help her and not her.
8          So I think it would be imprudent for the Court at
9    this point to go through the normal procedure and just accept
10   the Government's representation of the evidence.  I think
11   whether you call it a sanction or whether you call it simply
12   making sure that this doesn't happen again in the same case
13   where the Government has given no indication why it was that
14   they chose not to reveal this information, what they knew or
15   didn't know, that if they want to rely on the strength of the
16   case -- and I think 90 percent of what they talk about is the
17   strength of the case, because without the strength of the
18   case they have nothing.  There's no reason to detain
19   Ms. King.
20         So if they're going to do that, and if what they're
21   going to say is to contradict what their own witness says
22   that I provided to the Court so Your Honor can see the same
23   thing I'm looking at, I want to hear her testify.  If she's
24   going to get up and say something different, that Heather is
25   to blame for this, I want to hear it from her because I don't

1   trust them, and I don't think the Court should either at this

2   point.

3          So what that leaves us with -- well, and -- and --

4   it -- looking at what they didn't say, which is to try to

5   explain how this happened, how we ended up in the courtroom

6   where these things were not discussed, the Government says

7   things likes that I'm victim blaming because I describe the

8   victim's conduct.  This is why I attached -- I sealed all of

9   that stuff and put in a motion to the Court.  Pretty much

10   everything in my motion is taken verbatim from what the

11   victim told them over and over and over again.

12          What they hang on most -- again, if we're dealing

13   with the merits here at this point, is messages, text

14   messages, Facebook messages that they say came from Ms. King,

15   when we know that the pimp, who is still somehow not charged

16   in all of this, had control over her, was using her phone,

17   giving it back and forth, checking it when -- when -- when he

18   got -- well, when he started to wonder what they were doing.

19   He did it to the victim too.  I mean, this is what we're

20   doing.

21          And they want the Court to assume that everything

22   associated with that phone came from her.  Two points to that

23   that showed not only -- I'm -- I can't speculate at this

24   point what they know and what they don't know, because,

25   frankly, after seeing the response, I'm kind of stunned.  But

1  I know this:  The smoking gun that they put in their motion
2  saying that one of the texts said, you know, "I have a child
3  as old as you," and "I'm not going to have you talk to me
4  like," whatsoever it was.  The fact that she has a teenage
5  child is a smoking gun.

6         Now, I don't know whether they know and are hiding
7  it or whether they were just too lazy to ask, but the pimp
8  has a teenage child too.  So I don't know what the probative
9  value of that is.  But if that's their smoking gun, that
10 ain't it.

11        But more to the point about what they knew and
12 didn't know.  If Your Honor noticed, in the materials I
13 provided, the final interview with the victim or the most
14 recent one we have a report about, which I think was in May
15 if I'm not mistaken, the prosecutor personally went over
16 messages with the victim, and the victim explaining what
17 certain terms meant.  The victim was specific about the fact
18 that the pimp himself was threatening her and so forth.  But
19 there's not a word about any messages coming from Heather and
20 what they meant and who was doing what.

21        So one of two things is going on here.  Because
22 obviously if their case is based on these messages and there
23 is serious doubt at best about who sent them, and that's what
24 the case hangs on, and they printed out the messages and
25 showed them to the victim, one of two things happened.

1   Either they asked her questions like that, well, how do you

2   know who was sending which message or which message comes

3   from who?  Either they asked her that and they didn't like

4   the answers and they didn't write them in the report, or they

5   didn't want to ask the questions and they didn't.

6          And that is why, Judge, at the end of the day they

7   can say all they want to, put text messages in, accuse me of

8   victim blaming when I just quote the victim herself, but they

9   are the ones who are supposed to give the Court confidence in

10  the strength of their case as the touchstone of detaining

11  this woman.

12          From what I've seen in here, the whole point of the

13  strength of the case analysis is not to punish someone

14  upfront, obviously.  The point is this is a person who knows

15  it is very likely they're going to prison, there are severe

16  consequences that they're going to suffer and, therefore,

17  they have an incentive to flee and so forth.

18          The converse also has to be true.  That if the

19  Government's case is weak, then the person has every

20  incentive to behave themself and to have confidence that when

21  it all shakes out there will be a good result for them.

22          Your Honor has now seen the case as much as I have.

23  I am -- I will happily, if Ms. King decides on it, put my

24  faith in a jury of 12 people over them, because I don't think

25  anybody is going to believe the victim on this, on these

facts, from what we see in here, from what we know.

That teenage girl is going to have to testify. And
I assume, unless there's more shenanigans going on that we
don't know, she's going to testify to what she told agents
and the prosecutor over and over again. That Heather was a
victim just like she was, that she was in fear, that she was
beaten, that she was given black eyes, and that there was
repeated violent behavior by this man over a period of years.
And I don't think 12 people are going to convict her on those
facts.

If the Government has some evidence that's going to
convince us of that, let them put her on the stand.
Otherwise, I think the Court would not do well at all to
trust a second time what it turns out what the Court couldn't
trust the first time. As the old saying goes, "Fool me once,
shame on you, fool me twice, shame on me."

So without the strength of the case, Judge, her
cousin is back in court for the second time. She has another
friend here supporting her. That's a stable residence where
she wouldn't have to go anywhere or worry about anything.
It's pretty far outside of Charlotte.

I, you know, have some concerns for security wise
now that -- and this is something I kind of yesterday that I
told the Government about, which is that -- that Ms. King's
cousin, who's here in court, got a message from the pimp's

sister that someone had sent them, meaning the sister and the pimp, screenshots of my motion. So somebody went on ECF and alerted him and his family to what we're doing in court today. And obviously the redacted version, but they all know what's going on. And that's where we are, and that was not my doing. I followed the statute to do what I had to do. I asked the Government long before I filed this motion if they may agree to conditions of bond, and here we are.

There is no reason to deter -- to detain this woman for a process that I think she can have every confidence will be a favorable outcome for her. I'd hate to see her sit in jail awaiting that. So I'd ask the Court to release her on conditions.

THE COURT: All right. Ms. Spaugh.

MS. SPAUGH: Thank you, Your Honor.

In regard to the jail call email yesterday, I thought it was clear, apparently it was not. That's why I said we would advise the Court the existence of the calls as though the fact that she's still talking to her boyfriend Batten. I didn't mean that there's secret content and they were going to be talking about. That's why I said the existence of the calls. I received no follow-up questions. So I do apologize they apparently listened to a lot of calls that they didn't need to.

We obviously have a material disagreement here as

to the facts of this case.  The defendant has the Facebook
messages with the victim.  They have the defendant's entire
Facebook records.  They have the victim's Facebook records.
They have all the text messages.  They know the
communications between the people here.

And while they only want to talk about the victim's
statements, what they can't get around is what is in writing
by this defendant.  And what is in writing by this defendant
makes clear that she was the one sending the messages, which
is corroborated by things that the victim said like that she
kept the defendant updated while she was seeing plays to keep
her safe.

We don't know that the pimp had control over her
phone.  That's what she claims and that's certainly her
contention, but we contend otherwise.  We don't know that he
was logged into her phone and her Facebook every day and
sending all of these messages on numerous days from July to
September with the victim.

The question for the Court today is whether there
are conditions that can reasonably assure her appearance and
the safety of the community and whether she can overcome the
presumption of detention hearing.

When you look at nature and circumstances of the
offense, the weight of the evidence, her history and
characteristics, and the nature and seriousness of the danger

posed by her release, her active role in sex trafficking a minor demonstrates that she still poses a danger to other minors in the community.

She was actively arranging plays for the minor victim to engage in these commercial-sex acts. She had hotel stays booked in her name. She set her Cash App up at times for the minor victim to use. She bought her clothes and supplies. And she took some of her photos for advertisement, as well as we contend that she posted some of those advertisements with a MegaPersonal account which had her email that is on her Facebook account.

On one day she tells the victim to send her pictures. And then when apparently those pictures didn't include her body, she says, "Body pic too." And then some of those pictures are consistent with those used in commercial-sex advertisements.

She would text the customers and then relay the price and time frame to the minor victim, as reflected in our filing.

She would also direct the victim to do thinks like air out her room because she had customers, to shower or fix her hair.

She also brought in other girls to work with Batten, which is again corroborated by her Facebook messages and text messages.

On July 19th, she sent a text message to the minor victim letting her know that they went to get my home girl so she can help us make money too and we'd be back.

There's also messages where she told another girl who was looking to make money that they could post her and the girl they had made 400 last night. And days later she said she'd absolutely post her again. The Court saw that in our filing.

She's shown a disregard for the victim's well-being when she told her she wanted to take a break, that was cool, and that her stomach hurt. She said she can have a break unless a high-paying customer came. And while the victim had actually escaped to another city with family, she told her "to watch who she's talking to, they know everywhere she is." Later said, "we changed you, and you got ahead of yourself." She said, "I'm old enough to be your mother," not father, during that conversation.

The victim worked well with the defendant and the pimp again in December when she ran away. The defendant's messages from that time frame showed that she was texting customers while working two jobs. She told Batten to get them a room while she was at work and to find someone with an ID to get a room for people that were apparently sitting in a room when they could be making money. And then she became upset when they missed out on the money because she was

allowed to text while she was out of work -- while she was at
work.

She's still talking to this pimp on the phone.  The
last calls that we have that I gave to Mr. Adolf are from a
week ago, August 24th.  But she talked to him twice that day
and she talked to him almost every day before that, except
for when he was briefly in jail back in July, often more than
once a day.  That makes it very likely that if released,
she's going to get right back out there with him and commit
more crimes, and she's certainly a danger to other minors in
this community.

To establish a defense duress at trial get the
instruction on it, she'd have to show that she had no
reasonable choice but to commit this crime.  And the ability
to contact law enforcement is generally going to be a
reasonable alternative to committing this crime.  She won't
be able to establish that because on several occasions she
could have done so but she didn't.  That is shown by her
Facebook messages.  On July 21st, she told the victim that
police came to their door after one of the customers called
police and that they had to leave.  So she left instead of
contacting police that day.

On July 31st, she apparently saw police outside and
told the victim not to go out.  She said she was texting on
two cellphones.  She didn't use those to call the police.

On that same night, she told the minor victim that she was drunk at the bar as she continued to send her customers. And that same day she told someone else that she had a car and could go everywhere, evidencing that she had freedom of movement.

She also said that she worked a cleaning job during this time frame working about 30 hours a week. So that's 30 hours a week that she had away from the pimp to talk to law enforcement or not go back to what was going on, or stop what was she was doing, and she chose to keep returning to it.

Looking at the other 3142 factors, they all weigh towards her continued detention. She's facing a substantial amount of prison time if convicted. She has no employment to return to.

She has a failure to appear from June of this year in Georgia, which shows she has missed court.

She has an assault and battery conviction of 2010, showing that she is capable of violence.

She was arrested in 2017 for felony possession of, I believe, Schedule II controlled substance. That case remained pending until November of 2020.

While that was pending, she was charged with felony possession of stolen motor vehicle in 2018. And charged with possession of marijuana in 2019.

While those cases were dismissed, they do show a

1   history of criminal conduct while she's on pretrial release.

2           There's also a presumption of detention here.  And

3   due to the nature of the charges and the fact that a victim

4   is involved that is a minor, Your Honor, we contend that

5   almost every 3142 factor weighs towards her detention here.

6   We are asking the Court order her detained.

7           THE COURT:  All right.  Do you care to respond to

8   Mr. Adolf's observations about potential misstatements or

9   inaccurate information provided by the Government at the

10  earlier detention hearing?

11          MS. SPAUGH:  I guess briefly, Your Honor.

12          Our contention is that the information that they

13  believe is exculpatory and should have been provided does not

14  change the analysis under the Bail Reform Act because it does

15  not amount to a legal defense here.  We certainly acknowledge

16  this aspect of her relationship:  That it does appear she's

17  in a domestic violence relationship with the pimp, but it

18  does not undermine the case here.  It does not amount to a

19  legal defense.  It doesn't change the weight of the evidence

20  against her.  It's an issue for a jury or at sentencing the

21  mitigation, and it certainly does not show that she's not a

22  danger to the community and she's not a flight risk.  As well

23  as I point out was Ms. King is in court and we had the usual

24  three-day time period, I believe, from the initial and

25  detention.  She could have told her attorney what the

1  relationship was like and they could have presented that to
2  the Court.
3              MR. ADOLF:  Your Honor.
4              THE COURT:  Hang on.
5              The case is brought against Ms. King.  The obvious
6  question here is what's going on with Mr. Batten.  Can you
7  comment on that?
8              MS. SPAUGH:  All I can tell the Court is that the
9  investigation is ongoing.
10             THE COURT:  Well, please -- can you please
11 acknowledge how frustrating that must be?
12             MS. SPAUGH:  Yes, Your Honor, we do acknowledge
13 that.
14             THE COURT:  So in a nutshell, Ms. Spaugh, is your
15 -- is your detention argument basically it's a really bad
16 crime?
17             MS. SPAUGH:  Our detention argument is it is a
18 really bad crime, that we believe the weight of the evidence
19 is strong based on what is in writing here, her history and
20 characteristics weigh towards detention, as well as the
21 serious risk that if she gets out, she's going to reoffend.
22             THE COURT:  All right.  Mr. Adolf.
23             MR. ADOLF:  I'll be brief, Judge, because I think
24 what we just heard was almost verbatim what we heard at the
25 first hearing as if that evidence didn't exist and doesn't

1  matter.

2          And, you know, earlier when I talked about the

3  mentality of the prosecutor thinks the person is guilty and,

4  therefore, there's nothing exculpatory, well, she just -- we

5  just heard that from the other table.

6          There are two things that I -- that were -- that

7  the Government brought up that I do want to address.

8          Number one -- and I was listening for it when she

9  said, "We don't know who was using the phone at which time

10  and sending which text messages."  They interviewed the

11  victim at great length at least four times that I know of

12  over a period of months.  They went through those text

13  messages with her.  If they don't know, it's because they

14  don't want to know or because they got answers that they

15  didn't like.

16          The strength of their case comes down to asking the

17  Court to disbelieve their victim or to parse through what the

18  victim told them and say that everything that exculpates

19  Ms. King is now somehow not reliable.  I don't think 12

20  people are -- I think 12 people are going to make sure the

21  worth of that.

22          And my other point, Judge, is Ms. Spaugh's apology,

23  I guess it was, for making us scramble around to try to find

24  something inculpatory or something they were going to try to

25  use in the jail calls, when it turns out that she thinks that

1  the fact that Heather still has an emotional connection to

2  the pimp is evidence of guilt from the past that she

3  exercised independent judgment in participating in the sex

4  trafficking that was going on with the minor.

5        Have we just dialed the clock back 30, 40 years?

6  Do I need to explain to them what battered women's syndrome

7  is?  Do I need to explain to them the dynamics of domestic

8  violence and about how women who are beaten and mistreated

9  keep going back whether it's a fear of the person or whether

10 it's fear of the consequences if they leave?

11       In this case the victim told them that he chased

12 them down when they left.  Is that something I have to

13 explain to the Government or the Court?  Your Honor's been in

14 state court, and Your Honor's certainly seen enough cases

15 around here where that's an issue.  And very often we have

16 situations where we have to keep couples apart from each

17 other for pure physical safety.

18       Do I really have to explain that?  Am I -- I don't

19 even think I'm going to have to explain that to a jury.  Do

20 we even need to do that anymore?  That's going to be their

21 case, is that the fact that she still has feelings for him

22 and talks to him on the phone?  Not to mention the fact that

23 she's the one in jail.

24       If -- if -- the way a pimp works is managing to

25 convince the women that he's abusing and trafficking that

there's no other alternative, that they can't go to the
police, that they can't go anywhere else either because he's
going to find them, or he's manipulated them into thinking
that's what they're going to do.  Does anyone -- does this
need to be explained to anybody?  That's what their victim
told them.

Does that mean that there's a risk of that somehow
she's going to commit new crimes when she gets out on bond?
I mean, for sure we will have an order in place that she
can't have any contact with him.  But think about the fact
that if what he's been telling her is you can't trust the
police, there's nowhere you can go, and he chases her down
and beats her whenever she tries to leave, they've just
confirmed it because she can't trust them because I can't.  I
don't know that the Court can.

And guest what?  He's still on the street.  So
that's the proof.  He's telling her, you know what, I've
gotten you in deep enough so that you're in worse shape than
I am.  I'm going to escape.  I'm still out on the street.

Honestly, Judge, I've never been a prosecutor; so I
don't know what people feel like it takes to have enough
evidence to charge them.  But I -- I've seen people indicted
on a lot less than this.  And let's be honest.  Here's what's
really going on, because Your Honor will remember before she
was ever charged, Ms. King was -- the agents came and spoke

to her, took her back voluntarily to some whatever office and debriefed her. And what happened was she didn't give him what she needed. This is the weakness of their case: Is the text messages they can't prove coming from him without other people testifying to that because he was using her phone a lot of the time. That's the case.

I am firmly convinced -- Your Honor's been a prosecutor, has been in that same office. You can judge what you think is going on.

I think what happened was they weren't going to charge Ms. King if she was cooperative. But instead, she was minimizing -- she was still afraid of the pimp and still is today and perhaps rightly so. And so she messed around and said, oh, I thought she was 18 at first or whatever it was. Whatever nonsense she told him. They said, well, guess what, now we're going to indict her. Now she's going to face the 10-year mandatory minimum, and now she'll cooperate and do it the right way. And, you know, maybe when it's all over we'll be managamous, she'll get a 5K, she'll just get a few years and be a registered sex offender for life. And it all would have been worth it to bring in this pimp.

That's why we're here. They don't expect to go to trial on this case. They expect to have her testifying against the pimp. Maybe that will happen. That's going to be her decision down the road, but I look forward to that

1 opportunity whether it presents itself or not.

2        THE COURT:  Just so we're clear -- and I've read

3 your pleadings.  But just for the record, what is -- in a

4 nutshell, what is the information that you suggest was -- was

5 exculpatory that was not provided at the initial hearing that

6 should have been?

7        MR. ADOLF:  Well, Judge, I'm not going to read

8 verbatim the -- the victim interview reports that I provided

9 in the exhibit.  I -- I think that's -- I'm sure Your Honor

10 has revealed -- has reviewed those very carefully.

11        THE COURT:  Yeah.

12        MR. ADOLF:  I don't file a lot of these motions.  I

13 can't remember the last time I did.  But all of it.

14        That Ms. King was being beaten and threatened.

15 That her and the victim made plans to escape together from

16 him.  That the victim said at one point it was around seven

17 times that they had plotted to get away from him.  The one

18 time they actually did it he found them pretty quickly.  The

19 fact that she had been -- the victim had seen her beaten and

20 got two black eyes that lasted for weeks.  The fact that the

21 day the police first showed up and talked to the victim

22 Ms. King had managed to borrow some friend's car and actually

23 had her stuff and the victim's stuff in the car and they were

24 getting ready to escape.

25        The irony, of course, is that the police, I guess,

1  took the minor victim away, put her back in the group home

2  where she ran away from yet again to come back and start

3  doing the same stuff.  I don't remember whether it was with

4  Mr. Batten or with other people that she was doing what she

5  was doing when she couldn't get back up with him.

6          But, you know, the result of that day was only one

7  of them escaped.  So -- and that's consistent throughout her

8  statements.  I think -- we don't have her words.  They didn't

9  record it as far as I know.  This is all of the agent's

10  recollection of what she said.  But it is pretty damning, and

11  I don't think a jury is going to be happy hearing that and

12  saying that she is guilty of sex trafficking.  I don't see it

13  happening.

14          THE COURT:  Okay.  Ms. Spaugh, anything else?

15          MS. SPAUGH:  No, Your Honor.

16          THE COURT:  All right.  I want to do this -- and I

17  recognize this is be a little frustrating, but there is a lot

18  of efforts put into these pleadings.  I'd like to take these

19  under advisement, study these, and render an appropriate

20  ruling after I've done that.  So that will mean there will be

21  some delay.  But I appreciate your good work on this, and

22  I'll render a ruling just as quickly as I can.  All right?

23  Thank you.

24                        *     *     *

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the digitally-recorded proceedings transcribed under my direction.

Dated this the 7th day of September 2022.

/s/Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
Official Court Reporter